**IN FEDERAL DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| DRE HEALTH CORPORATION,<br><br>Plaintiff,<br><br>vs.<br><br>TWO CANOES, LLC,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 4:21-cv-00936 |

**PLAINTIFF DRE HEALTH CORPORATION'S FIRST**
**AMENDED COMPLAINT AND JURY DEMAND**

Plaintiff DRE Health Corporation ("DRE"), by and through its undersigned counsel, hereby states its First Amended Complaint against Defendant Two Canoes LLC ("Two Canoes") and alleges as follows upon information and belief and evidence in its possession:

## PARTIES

1. Plaintiff DRE is a Missouri domestic for-profit corporation with its registered agent address in St. Louis, Missouri and its principal place of business in Kansas City, Missouri.

2. DRE is a manufacturer, wholesaler, distributor, and retailer of medical equipment, instruments, and supplies.

3. Defendant Two Canoes is Delaware limited liability company with its principal place of business in the State of New York.

4. Two Canoes is not authorized to do business in Missouri and has no resident agent in Missouri and may be served on its Delaware Registered Agent.

5. Two Canoes is a self-described "venture development company."

## NATURE OF THE ACTION

6. DRE brings this action to recover damage that resulted from Two Canoes' failure to provide quality personal protective equipment ("PPE") in the midst of the COVID-19 Pandemic ("the Pandemic"), in contravention of all agreements between DRE and Two Canoes and of the laws of Missouri.

7. In November 2020, in light of the need for additional PPE for healthcare providers, other employers, and private citizens, DRE intended to purchase vinyl examination gloves fit for resale and use as PPE.

8. DRE therefore sought to purchase vinyl examination gloves from Two Canoes in November 2020.

9. DRE sent purchase order number 278179 (the "Purchase Order") to Two Canoes on or about November 2020. *See* Exhibit A, DRE Purchase Order No. 278179.

10. The Purchase Order was for the purchase of vinyl examination gloves at a cost of $57.50 per case, with 10 boxes of 100 gloves in each case.

11. Two Canoes issued invoice number 1223 (the "Invoice") back to DRE, reflecting purchase order number 278179, on or about November 6, 2020. *See* Exhibit B, Two Canoes Invoice No. 1223.

12. The Invoice reflected Two Canoes' agreement to sell 30,760 cases of vinyl examination gloves, totaling 30,760,000 vinyl examination gloves ("PPE Gloves") to DRE at the price per unit set by DRE's Purchase Order.

13. The Invoice reflected that the PPE Gloves were to be powder free, vinyl examination gloves, of various sizes ranging from small to extra-large.

14. DRE ordered the PPE Gloves from Two Canoes in order to fulfill orders that DRE itself received from DRE's customers.

15. DRE contracted with end users for the purchase of needed PPE.

16. The PPE Gloves were the PPE required by DRE's customers.

17. Two Canoes understood that the PPE Gloves were for resale to DRE's customers.

18. Two Canoes understood that the PPE Gloves needed to be fit for their intended purpose as PPE and for resale as PPE.

19. But instead of delivering the PPE Gloves at the quality DRE required, Two Canoes delivered gloves of poor quality in mismarked packaging.

20. Two Canoes delivered vinyl examination gloves that were simply unfit for use as PPE.

21. In recognition of the Pandemic and the importance of the United States having an adequate supply of PPE, DRE took efforts to mitigate the effects of the sub-par product delivered by Two Canoes.

22. Such mitigation efforts were accomplished at a substantial cost to DRE.

23. Rather than work with DRE in such efforts, Two Canoes has refused to cooperate in any respect in unraveling the effects of their poor products.

**JURISDICTION AND VENUE**

24. The Missouri Constitution provides that the State's Circuit Courts have "original jurisdiction over all cases and matters, civil and criminal." Mo. Const., § 14(a).

25. Jurisdiction for DRE's original Complaint was proper in the Circuit Court because this is a Civil Action where the principal economic loss was experienced in Missouri by a Missouri corporation located in Kansas City, Missouri, and because of Defendant's contacts with Missouri.

26. The parties likewise stipulated in their written agreements that the courts of Missouri were a proper venue for this dispute.

27. Jurisdiction is proper in this Court under 28 U.S.C. § 1332 because the parties are completely diverse.

28. Personal jurisdiction is proper in this Court because jurisdiction is proper under the Constitution and the laws of Missouri.

## MATERIAL FACTS

### *DRE's Glove Customer Orders PPE*

29. DRE supplies high-quality medical equipment to providers and end-users in Missouri and throughout the United States.

30. During the Pandemic, DRE has experienced increased demand for PPE.

31. PPE became difficult to obtain during the Pandemic at any price.

32. Throughout the Pandemic, including during 2021, PPE was difficult to obtain in sufficient quantities for use by medical providers and other end users.

33. DRE received an order from a customer ("DRE's Glove Customer") for PPE in or around November of 2020.

34. DRE's Glove Customer required PPE in the form of vinyl examination gloves certified for non-surgical, sterile uses.

35. DRE's Glove Customer requested that DRE fulfill such order using gloves manufactured by Shijiazhuang Hongray Group ("Hongray").

### *Hongray Is An Accepted Manufacturer Who Has Passed DRE's Quality Inspections*

36. Hongray is a reputable manufacturer of PPE and of vinyl examination gloves.

37. DRE has previously inspected PPE supplied by Hongray, including vinyl examination gloves, using audits and inspection procedures and has found such PPE to be of high quality and fit for its intended purpose.

38. DRE subjected vinyl examination gloves manufactured by Hongray to multiple inspections before accepting Hongray as a manufacturer of such PPE for DRE's customers.

39. DRE only purchases PPE from manufacturers who have provided authenticated certificates of compliance with federal safety standards.

40. Hongray provided all relevant certificates of compliance with federal safety standards to DRE before DRE accepted Hongray as a manufacturer of PPE.

41. To date, Hongray vinyl examination gloves have passed all quality inspections conducted by DRE.

42. DRE's Glove Customer has previously purchased vinyl examination gloves manufactured by Hongray.

43. DRE's Glove Customer therefore specifically ordered Hongray gloves from DRE in November of 2020, and DRE agreed to supply only Hongray gloves to fulfill such order.

***DRE Purchased Hongray Gloves From Two Canoes***

44. DRE contracted with Two Canoes in November 2020 to purchase vinyl examination gloves manufactured by Hongray in order to fulfill the requirements of DRE's Glove Customer.

45. Two Canoes represented to DRE that the PPE Gloves would be manufactured by Hongray.

46. Throughout their negotiations, DRE repeatedly referred to the PPE requested by DRE's Glove Customer as manufactured by Hongray and as "Hongray gloves."

47. Hongray has manufactured PPE for purchase by DRE in the past, including during the Pandemic.

48. DRE is aware of manufacturers who have produced low-quality PPE during the Pandemic, and, for this reason, DRE has a practice of maintaining heightened vigilance over PPE it purchases from manufacturers it has not worked with in the past.

49. DRE has never received customer complaints related to the quality or packaging of PPE manufactured by Hongray.

50. DRE has never received customer complaints related to the quality or packaging of vinyl examination gloves manufactured by Hongray.

51. DRE therefore contracted with Two Canoes in order to fulfill DRE's Glove Customer's order for Hongray-manufactured vinyl examination gloves.

52. DRE sent the Purchase Order for vinyl examination gloves to Two Canoes on or about November 5, 2020.

53. DRE's Purchase Order sought vinyl examination gloves at a cost of $57.50 per case, with each case containing ten boxes, and each box containing 100 vinyl examination gloves. *See* Exhibit A:

| Description | UOM | Qty. | Unit Price | Ext. Price ($USD) |
|---|---|---|---|---|
| VINYL EXAMINATION GLOVES 100/BX, 10BX/CS, POWDER FREE, CLEAR (SIZE BELOW) | CS | 88,825 | $ 57.50 | $ 5,107,437.50 |
| *SMALL* | CS | 9,495 | | |
| *MEDIUM* | CS | 36,270 | | |
| *LARGE* | CS | 36,080 | | |
| *EXTRA LARGE* | CS | 6,980 | | |
| SUBTOTAL | CS | 88,825 | | $ 5,107,437.50 |
| **TOTAL EXT PRICE** | | | | $ 5,107,437.50 |

54. On the face of its offer to purchase cases of vinyl examination gloves for $57.50 per case, DRE Health explicitly stated that its offer was subject to certain terms outlined on the Purchase Order and to further additional terms available for review at its linked website. *Id*; *See also* Exhibit C, Terms and Conditions of Purchase.

55. The Purchase Order offered to purchase 88,825 cases of vinyl examination gloves for $57.50 per case.

56. The Purchase Order offered to purchase such items with payment due upon inspection at a bonded warehouse in China.

57. The Purchase Order also included additional terms other than terms related to price and quantity. *See* Exhibit A:

P.O. Number: 278179
Invoice (QUOTE) Number: N/A
Terms: 100% payment will be remitted immediately upon DRE's satisfactory inspection of the products at DHL's bonded warehouse in China. DRE Health requests this facility's address and point of contact for our staff to validate the existence of the goods ASAP as well as either an inventory manifest from DHL, a video of live products, or video call showing the product exists in inventory 11/6 CN AM. Shipping terms are EXW DHL CHINA BONDED WAREHOUSE. Additional terms as outlined in purchase terms & conditions available at www.drehealth.com.

58. DRE's email transmitting the Purchase Order further reiterated that the offer to purchase in the Purchase Order was subject to additional "purchase" terms, including those listed on the Purchase Order under the "Terms" section and reproduced on DRE's linked website. *See* Exhibit D, Transmission Email for Offer.

59. Two Canoes responded with the Invoice on or about November 6, 2021.

60. The Invoice rejected two terms in DRE's Purchase Order by countering with different proposed terms and was silent as to all other terms in DRE's Purchase Order.

61. Countering DRE's terms, the Invoice proposed that payment be due "on receipt" and that the total quantity of gloves would be 30,760 cases. *See* Exhibit B:

| ACTIVITY | DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|---|
| GLOVES | VINYL EXAMINATION GLOVES 100/BX, 10BX.CS, POWER FREE, CLEAR (UNIT BY CASE) SMALL | 2,244 | 57.50 | 129,030.00 |
| GLOVES | VINYL EXAMINATION GLOVES 100/BX, 10BX.CS, POWER FREE, CLEAR (UNIT BY CASE) MEDIUM | 19,424 | 57.50 | 1,116,880.00 |
| GLOVES | VINYL EXAMINATION GLOVES 100/BX, 10BX.CS, POWER FREE, CLEAR (UNIT BY CASE) LARGE | 7,347 | 57.50 | 422,452.50 |
| GLOVES | VINYL EXAMINATION GLOVES 100/BX, 10BX.CS, POWER FREE, CLEAR (UNIT BY CASE) EXTRA LARGE | 1,745 | 57.50 | 100,337.50 |

62. Two Canoes explicitly accepted DRE's proposed price of $57.50 per case. *Id*.

63. DRE's additional terms and conditions, incorporated by explicit reference in its Purchase Order, were material.

64. DRE's additional terms and conditions covered topics related to quality, packaging, and other issues commonly agreed to between parties transacting for the sale of medical equipment generally, and PPE in particular.

65. DRE would not have agreed to purchase any PPE from Two Canoes at the agreed price without such terms and conditions of purchase.

66. DRE's additional terms and conditions include topics commonly negotiated between parties when contracting for the sale or purchase of PPE.

67. Two Canoes did not, in the Invoice or in any other manner, reject other terms offered by DRE in the Purchase Order. *Id.*

68. Two Canoes expressed during negotiations that its standard non-price terms would apply to any sale unless the parties specifically agreed otherwise.

69. Two Canoes therefore accepted DRE's offer to purchase of the PPE Gloves, the same being 30,760 cases of vinyl examination gloves at a $57.50 per case.

70. Two Canoes therefore accepted all terms as offered by DRE other than the quantity of vinyl examination gloves and the term for delivery of payment.

71. Two Canoes confirmed during negotiations that DRE was contracting for Hongray-manufactured gloves only and that the price of $57.50 per case was contingent on DRE purchasing only Hongray-manufactured gloves through Two Canoes. *See Exhibit D*, Two Canoes' Acceptance Email.

72. DRE intended to sell a portion of these 30,760 cases to DRE's Glove Customer, who had specifically ordered Hongray-manufactured gloves.

73. DRE intended to sell the remaining cases to other customers who also required high quality PPE from a reputable and reliable manufacture such as Hongray.

74. DRE paid Two Canoes the entire invoiced amount of $1,768,700 before taking delivery of the PPE Gloves, per the terms of the Parties' agreement.

75. The parties negotiations over terms, price, quantity, and relevant timelines were conducted primarily over the telephone and during conversations.

76. The parties continued to discuss details related to the PPE after their agreement was formed, and an officer and director of Two Canoes discussed issues related to logistics, quality, and order fulfillment when visiting DRE's Missouri facilities in November 2020.

77. During conversations before and after the parties exchanged the documents constituting their written agreement, Two Canoes made numerous assurances to DRE that the PPE would be manufactured by Hongray and would be delivered in a timely manner.

78. Two Canoes delivered vinyl examination gloves that were not manufactured by Hongray in fulfilling a portion of the Purchase Order.

79. Upon information and belief, Two Canoes never intended to fulfill the full Purchase Order with PPE of the quality or make it represented to DRE throughout the parties' negotiations.

***DRE Takes Delivery From Two Canoes of Defective and Counterfeit PPE***

80. DRE received delivery of the PPE Gloves in shipments between November 2020 and January 2021.

81. DRE received such shipments at its bonded warehouse facility in China before shipping the PPE Gloves to warehouses and customers in the United States, including to DRE's Glove Customer.

82. DRE inspected the PPE Gloves in its customary and routine manner, including opening test boxes to confirm the contents, but did not break any of the seals.

83. DRE's inspection procedures met industry norms and standards.

84. DRE's inspection procedures were premised on the gloves being genuine, Hongray-manufactured gloves and from a manufacturer subject to DRE's more robust audits and quality inspections.

85. DRE's inspection specifically included inspections of packaging to confirm that the PPE were all genuine Hongray products.

86. DRE's inspection specifically included opening shipping boxes to examine unit-packaging to confirm that all relevant labels, shipping, and factory-inspection markers indicated that the PPE were all genuine Hongray products.

87. All of the PPE inspected by DRE were labeled as Hongray-produced products.

88. All of the shipping packaging for the PPE was clearly labeled with Hongray labels and marks. *See* Exhibit E:




89. All of the unit packaging for the PPE was clearly labeled with Hongray labels and marks. *See* Exhibit F:



90. DRE reasonably relied on such representations, together with its numerous conversations and negotiations with Two Canoes, to assume that the PPE was manufactured by Hongray.

91. DRE's quality assurances processes incorporated previous assessments made of Hongray's quality and manufacturing process.

92. DRE therefore cleared some of the cases of PPE Gloves for shipment to DRE's Glove Customer in February and March of 2021.

93. Before DRE would have purchased or shipped any PPE from an unknown manufacturer, DRE would have needed to perform its full and robust quality assurance assays, involving destructive testing and audits of the manufacturing process itself.

94. DRE would not have contracted with Two Canoes at the agreed price or quantity levels if DRE believed it had to perform more comprehensive quality assurance assays for a non-Hongray manufacturer.

95. In March of 2021, DRE's Glove Customer informed DRE that the PPE Gloves were contaminated and that the packaging did not reflect the actual vinyl examination gloves contained in each box.

***DRE Learns Of Counterfeit Products***

96. DRE's Glove Customer informed DRE in March 2021 that the PPE Gloves it had received were defective and counterfeit.

97. All of the products supplied by Two Canoes were packaged and labeled to clearly state that they were produced by Hongray.

98. After being informed by its Glove Customer of potential issues with the PPE Gloves, DRE inspected the rest of the shipment more closely and determined that boxes of

authentic Hongray PPE were intermixed and interspersed with defective and counterfeit Hongray PPE products.

99. Much of the Hongray labels and packaging were false and deceptive.

100. Much of the PPE included the false Hongray labels.

101. DRE's Glove Customer documented multiple instances where the PPE Gloves were contaminated with various foreign items.

102. DRE's Glove Customer documented that the PPE Gloves it received were packaged in mismatched batches, with individual vinyl examination gloves of multiple sizes packaged in a single box despite each box being labeled for only one glove size.

103. DRE's Glove Customer further documented that the PPE Gloves fell outside of durability standards, tearing easily with light use.

104. DRE's Glove Customer further documented that the PPE Gloves were not created in standard sizes.

105. All such defects would not be visible during a customary search or inspection of the PPE before acceptance because sealed medical products would be effectively destroyed or made unusable by an inspection that broke any of the sealed packaging.

106. Because authentic Hongray PPE was interspersed with defective and counterfeit PPE products, it was very difficult to conduct an inspection which would have identified any issues.

107. Upon information and belief, by intermixing authentic and counterfeit Hongray PPE products, it was Two Canoes' intention to mislead and defraud DRE into believing the entire shipment was authentic so that it passed inspection.

108. All such defects took time to detect: DRE's Glove Customer believed the gloves were supplied by DRE and from a reputable manufacture, and such customer did not immediately suspect that there were systematic defects in the PPE.

109. All such defects further took time to detect because DRE's Glove Customer and DRE needed time to conduct more fulsome assays of the PPE provided by Two Canoes.

110. The more fulsome assays detected systematic failings that would have been discovered by DRE had it known it was not purchasing gloves from Hongray, a previously vetted manufacturer, because DRE would have conducted its full quality assurance testing before agreeing to purchase any PPE from a new and unevaluated source.

111. DRE conducted its own audit of the PPE Gloves and determined that the defects reported by DRE's Glove Customer were found in the samples examined.

112. Further, both DRE and DRE's Glove Customer showed Hongray examples of the PPE Gloves that DRE and DRE's Glove Customer had determined may be counterfeit and defective. Hongray confirmed that it did not manufacture the gloves, and that they were counterfeit.

113. DRE and DRE's Glove Customer, therefore, each conducted their own diligence into quality defects in the PPE Gloves –including by engaging in discussions with the company it reasonably believed to the manufacturer of the gloves – and DRE alerted Two Canoes promptly upon concluding Two Canoes sold counterfeit products.

114. Without breaking the seal of the PPE Gloves, DRE cannot determine which packages contain authentic Hongray gloves and which contain counterfeit gloves that are not up to quality standards. Thus, DRE cannot sell any of the PPE Gloves.

115. As soon as practicable after delivery, DRE informed Two Canoes that DRE was rejecting the PPE Gloves in keeping with the rights reserved by DRE and by the agreement of the Parties.

116. The PPE Gloves are unfit for any medical procedures or examinations.

117. The PPE Gloves are unfit for any marketable use.

118. DRE informed Two Canoes, as soon as practicable after delivery, that the PPE Gloves were unfit for any medical procedures or examinations and were further unfit for any marketable use.

119. Two Canoes refused to take back the PPE Gloves or to refund any of the $1,768,700 that DRE paid to Two Canoes under the Invoice.

120. Two Canoes' refusal to take back the PPE Gloves, to replace the PPE Gloves with gloves fit for their purpose as PPE, or to refund DRE's funds violated the Parties' agreement. *See* Exhibit C, §§ 11.4, 15.1, 15.2, 16.1.

***Two Canoes Significantly Damaged DRE***

121. As a result of Two Canoes' actions in selling defective and counterfeit PPE to DRE, DRE's business relationships and marketplace reputation have suffered.

122. Two Canoes violated its agreement to sell Hongray-manufactured vinyl examination gloves to DRE for gloves unfit for their intended purpose as PPE.

123. Two Canoes injured DRE by selling DRE unmerchantable gloves.

124. Two Canoes injured DRE by selling DRE defective gloves.

125. Two Canoes injured DRE by knowingly concealing that many of the PPE Gloves it sold to DRE were not manufactured by Hongray.

126. Two Canoes further damaged DRE because DRE incurred millions of dollars in damages in order to cure defects with products shipped to DRE's Glove Customer.

127. Two Canoes was therefore the proximate cause of a host of damages DRE suffered because Two Canoes wrongfully sold defective and counterfeit vinyl examination gloves to DRE.

## FIRST CAUSE OF ACTION
**(Fraud)**

128. DRE incorporates by reference all previous allegations as though fully stated and set forth herein.

129. Two Canoes made fraudulent misrepresentations to DRE.

130. Two Canoes made fraudulent misrepresentations to DRE even knowing that DRE relied on those misrepresentations.

131. DRE was reasonable in assuming that Two Canoes accurately represented –through labeling and oral representations –that the PPE Two Canoes offered for sale was produced by Hongray.

132. DRE was reasonable in assuming that Two Canoes accurately represented –through labeling and oral representations –that the PPE Gloves Two Canoes offered for sale met certain quality and composition standards.

133. DRE was reasonable in assuming that Two Canoes accurately represented –through labeling and oral representations –that the PPE Gloves Two Canoes offered for sale conformed to the material representations made throughout negotiations by Two Canoes.

134. DRE conducted industry-standard diligence when inspecting the PPE offered by Two Canoes, in addition to repeatedly confirming its understanding of the make and quality of the PPE with Two Canoes.

135. DRE would have conducted additional diligence and quality assurance on the PPE had Two Canoes not fraudulently labeled the PPE Gloves as all manufactured by Hongray.

136. DRE would have conducted additional diligence and quality assurance on the PPE had Two Canoes not fraudulently concealed the actual manufacturer of the PPE.

137. Two Canoes knew during and after negotiations and the conveying of its assurances that such assurances and representations were false.

138. Two Canoes knew before, during, and after DRE's inspection of the PPE that a portion of the PPE was not accurately labeled and Two Canoes intended for DRE to rely on the descriptions of the products as labeled by Two Canoes.

139. Two Canoes intentionally interspersed authentic and counterfeit Hongray PPE in an effort to fraudulently induce DRE into believing the entire shipment was authentic and clearing the shipment through inspection.

140. Two Canoes intended, through misrepresentations, to induce and entice DRE into entering a contract for the purchase of PPE and, further, to induce DRE into remitting payment for the same.

WHEREFORE, DRE prays for judgment against Defendants for an amount in excess of $1,768,700.00, for its reasonable attorneys' fees, for prejudgment interest as allowed by contract or applicable law, for the costs of this action, punitive and exemplary damages, and for any and all further relief which the Court deems just and equitable.

## SECOND CAUSE OF ACTION
**(Breach of Contract – Counterfeit Goods)**

141. DRE incorporates by reference all previous allegations as though fully stated and set forth herein.

142. DRE and Two Canoes entered into written contracts for the purchase of PPE Gloves.

143. Two Canoes contracted and guaranteed that it would deliver goods "in accordance with the quality intended" and "in accordance with the demands made in the agreement, the documents belonging to the agreement, and/or made available, as well as with the norms and specifications set by [DRE] and samples approved by it." Exhibit C, § 10 (Quality Guarantees).

144. Two Canoes further contracted and guaranteed that the PPE Gloves it delivered to DRE would be manufactured by Hongray.

145. DRE fulfilled all of its obligations under its contract with Two Canoes by paying Two Canoes $1,768,700 in consideration.

146. Two Canoes concealed from DRE that it did not supply Hongray-manufactured goods in fulfilling DRE's Purchase Order.

147. Few of the PPE Gloves for which DRE paid $1,768,700 conformed to the Parties' contractual agreement, and determining those that do conform to the agreement would necessitate breaking the seal on the gloves, causing them to become unmarketable.

148. Two Canoes therefore breached its contract with DRE and did not supply goods manufactured by Hongray.

149. DRE was thereby damaged by Two Canoes.

150. Two Canoes caused injury to DRE because DRE paid a premium for goods produced by a reputable manufacturer and because DRE has not been able to verify the quality of the manufacturing processes used by Two Canoes' actual supplier, leading to further reputational harm for DRE.

151. Therefore, as a result of Two Canoes' breach and under the terms of the Parties' contractual agreement, Two Canoes is liable to DRE for compensatory and consequential damages, totaling the entire value of the $1,768,700 paid for the nonconforming PPE Gloves in addition to consequential damages, fees, and costs.

WHEREFORE, DRE prays for judgment against Defendants for an amount in excess of $1,768,700.00, for its reasonable attorneys' fees, for prejudgment interest as allowed by contract or applicable law, for the costs of this action, and for any and all further relief which the Court deems just and equitable.

**THIRD CAUSE OF ACTION**
**(Breach of Contract – Defective and Unmerchantable Goods)**

152. DRE incorporates by reference all previous allegations as though fully stated and set forth herein.

153. The Parties contractually agreed that purchased goods that were packaged in a manner deviating from the usual industry standard could be returned at DRE's discretion for a full refund up to one year after delivery. Exhibit C, § 15.2.

154. Two Canoes delivered PPE Gloves in packaging that did not conform to the actual goods within each box, and the PPE Gloves were packaged in a manner deviating from what is usual for the goods concerned.

155. The Parties contractually agreed that purchased goods that were made unmarketable by Two Canoes' actions could be returned for a full refund at DRE's discretion. Exhibit C, § 15.1.

156. Two Canoes chose its own manufacturer for the PPE Gloves wholly apart from any input by DRE, thereby eliminating the ability of DRE to sell the PPE Gloves as a merchant because DRE has no way to validate the safety or efficacy of the product as PPE during the Pandemic.

157. The Parties contractually agreed that Two Canoes would repair or replace any defective goods purchased by DRE. Exhibit C, § 16.1-2.

158. Two Canoes refused to replace any of the defective PPE Gloves or to take delivery and return of the same.

159. The Parties contractually agreed that Two Canoes would be "liable for any damage and costs, inclusive of business and other indirect damage (whereby loss of profit), arising from defects" in the PPE Gloves, "whether attributable or not" to Two Canoes directly. Exhibit C, § 17.1.

160. The PPE Gloves have defects of various kinds related to their composition, quality and workmanship –defects that make the gloves less durable, prone to breakage, and unsterile for medical environments –and DRE has suffered from lost business and reputational harms because of Two Canoes' refusal to deliver goods fit for their intended use and purpose.

161. DRE was thereby damaged by Two Canoes.

162. Therefore, as a result of Two Canoes' breaches and under the terms of the Parties' contractual agreement, Two Canoes is liable to DRE for compensatory and consequential damages, totaling the entire value of the $1,768,700 paid for the nonconforming PPE Gloves in addition to lost profits, the costs of replacing the PPE Gloves, and other business losses associated with unraveling the effects of Two Canoes' breaches, as well as fees and costs.

WHEREFORE, DRE prays for judgment against Defendants for an amount in excess of $1,768,700.00, for its reasonable attorneys' fees, for prejudgment interest as allowed by contract or applicable law, for the costs of this action, and for any and all further relief which the Court deems just and equitable.

**FOURTH CAUSE OF ACTION**
**(Missouri Uniform Commercial Code – Express Warranties)**

163. DRE incorporates by reference all previous allegations as though fully stated and set forth herein.

164. Two Canoes made express representations and warranties regarding the manufacture of the PPE Gloves and regarding the fitness of the PPE Gloves for use as PPE in certain medical environments as part of its negotiations with DRE.

165. DRE inspected products that were labeled as manufactured by Hongray before agreeing to remit funds for any of the PPE supplied by Two Canoes, but such labeling was intentionally false and mislead DRE.

166. DRE made such inspections in order to perform its own diligence and for the benefit of its customers and patients during the Pandemic, and DRE's inspection was also intended to assure that Two Canoes was, in fact, selling DRE only Hongray-manufactured PPE.

167. Two Canoes made express representations and warranties as to the quality and durability of the PPE Gloves as part of its negotiations with DRE, including warranties that the PPE Gloves met industry standards for composition, durability, and cleanliness.

168. DRE evaluated samples of vinyl examination gloves manufactured by Hongray before agreeing to purchase any such goods, and DRE reasonably believed the PPE Gloves conformed to the samples it reviewed.

169. Two Canoes made such warrants and representations to induce DRE to purchase the PPE Gloves and such warranties and representations were material factors in DRE's decision to purchase from Two Canoes.

170. In return for such warrants and in reliance on the same, DRE agreed to purchase the PPE Gloves for $1,768,700 in valuable consideration.

171. DRE fulfilled all of its obligations under its contract with Two Canoes by paying Two Canoes the full value of $1,768,700 in consideration.

172. The PPE Gloves did not conform to Two Canoes' warranted standards of composition, durability, and cleanliness.

173. The PPE Gloves did not conform to representations made by Two Canoes that formed the basis for the Parties' bargain.

174. The PPE Gloves did not conform to Two Canoes' affirmations of fact regarding their composition, durability, cleanliness, or source of manufacture.

175. The PPE Gloves did not conform to Hongray-manufactured samples previously reviewed by DRE because they deviated in size, durability, composition, and cleanliness.

176. DRE gave Two Canoes notice within a reasonable time upon learning that the PPE Gloves did not conform to Two Canoes' warrants and representations.

177. DRE's notice was within a reasonable time because the defects in the products were concealed through fraudulent labeling and because authentic products were intermixed with counterfeit and defective products.

178. DRE's notice was further reasonable because only destructive assays could have determined that the PPE supplied by Two Canoes was defective, counterfeit, and non-conforming.

179. DRE's notice was further reasonable because its inspections were premised on Two Canoes accurately and truthfully labeling the PPE it offered for sale.

180. Two Canoes delivered PPE Gloves not fit for any purpose and full of contaminants and quality defects.

181. The PPE Gloves therefore have no marketable value to DRE.

182. Two Canoes refused to honor DRE's rejection of the PPE Gloves.

183. As a direct result of these failures of the PPE Gloves to conform to Two Canoes' representations and warrants, DRE was damaged.

184. Two Canoes refused to comply with its obligations under Missouri's Uniform Commercial Code, Section 400.2-711, and would not refund any of the consideration paid for the PPE Gloves or assist DRE in any effecting cover contracts necessary for the benefit of DRE's customers or DRE's Glove Customer, despite the ongoing nature of the Pandemic.

185. Two Canoes' multiple breaches of express warranty were the proximate cause of numerous direct and consequential damages suffered by DRE, including lost profits, loss of reputation, and harm to DRE's business relationships.

186. Therefore, as a result of Two Canoes' breaches of warranty and delivery of defective and counterfeit products, and under Missouri's Uniform Commercial Code – especially and without limitation Sections 400.2-711, 400.2-712, 400.2-713, 400.2-714, and 400.2-715 – Two Canoes is liable to DRE for compensatory and consequential damages, totaling the entire value of the $1,768,700 paid for the nonconforming PPE Gloves in addition to lost profits, the costs of replacing the PPE Gloves, and other business losses associated with unraveling the effects of Two Canoes' breaches, including lost profits as well as fees and costs.

WHEREFORE, DRE prays for judgment against Defendants for an amount in excess of $1,768,700.00, for its reasonable attorneys' fees, for prejudgment interest as allowed by contract or applicable law, for the costs of this action, and for any and all further relief which the Court deems just and equitable.

**FIFTH CAUSE OF ACTION**
**(Missouri Uniform Commercial Code – Implied Warranties of Fitness & Merchantability)**

187. DRE incorporates by reference all previous allegations as though fully stated and set forth herein

188. DRE is a merchant in the normal course of its business, dealing in PPE as a part of its regular business.

189. Two Canoes is a merchant in the normal course of its business, dealing in PPE as a part of its regular business.

190. DRE informed Two Canoes that the PPE Gloves were intended for sale and use for a particular purpose as PPE during the Pandemic.

191. DRE relied on Two Canoes to safely and securely source goods from Hongray in order to fulfill the Invoice and Purchase Order.

192. DRE relied on Two Canoes to provide PPE Gloves fit for their purpose.

193. Two Canoes never disclaimed or modified any implied warranties in its agreements with DRE.

194. DRE used the PPE Gloves for their intended purpose and sold them as PPE to its customers during the Pandemic.

195. The PPE Gloves, however, were riddled with quality and durability issues and are not merchantable.

196. The PPE Gloves have defects of various kinds related to their composition, quality and workmanship –defects that make the gloves less durable, prone to breakage, and unsterile for medical environments –and DRE has suffered from lost business and reputational harms because of Two Canoes' refusal to deliver goods fit for their intended use and purpose as PPE.

197. The PPE Gloves have no practical use as PPE because of their defects and because the manufacture of the gloves cannot all be traced to Hongray or to another safe and reputable manufacturer.

198. The PPE Gloves were not contained, packaged, and labeled in a manner making them able to pass without objection in their trade, and the individual vinyl examination gloves do not conform to the sizes or descriptions on their exterior packaging.

199. DRE gave Two Canoes notice that the PPE Gloves were not fit for their intended purpose as PPE within a reasonable time after it learned of the same.

200. DRE gave Two Canoes notice that the PPE Gloves are not in any way merchantable within a reasonable time after it learned of the same.

201. Two Canoes' multiple breaches of implied warranty were the proximate cause of numerous direct and consequential damages suffered by DRE, including lost profits, loss of reputation, and harm to DRE's business relationships.

202. As a direct result of the PPE Gloves being unfit for their particular purpose, DRE was damaged.

203. Therefore, as a result of the PPE Gloves being unfit for their particular purpose as PPE and of Two Canoes' breaches of warranty and delivery of defective and counterfeit products, and under Missouri's Uniform Commercial Code – especially and without limitation Sections 400.2-711, 400.2-712, 400.2-713, 400.2-714 and 400.2-715 – Two Canoes is liable to DRE for compensatory and consequential damages, totaling the entire value of the $1,768,700 paid for the nonconforming PPE Gloves in addition to lost profits, the costs of replacing the PPE Gloves, and other business losses associated with unraveling the effects of Two Canoes' breaches, as well as fees and costs.

WHEREFORE, DRE prays for judgment against Defendants for an amount in excess of $1,768,700.00, for its reasonable attorneys' fees, for prejudgment interest as allowed by contract

or applicable law, for the costs of this action, and for any and all further relief which the Court deems just and equitable.

**SIXTH CAUSE OF ACTION**
**(Indemnification)**

204. DRE incorporates by reference all previous allegations as though fully stated and set forth herein.

205. The Parties contractually agreed that Two Canoes "shall hold harmless and indemnify [DRE] against any and all claims by third parties with regard to defects to the goods, under whatever name." Exhibit C, §16.5.

206. DRE was sued in the State of New York, in the matter of *WynnMed Inc. v. DRE Health Corporation*, removed to the Eastern District of New York as Case No. 1:21-cv-03105 (the "New York Litigation").

207. In the New York Litigation, the plaintiff alleged that DRE supplied defective goods and was therefore liable to plaintiff under various common law and statutory actions.

208. The allegedly defective goods at issue in the New York Litigation were composed of PPE Gloves supplied by Two Canoes.

209. DRE litigated the New York Litigation at significant cost to itself.

210. Two Canoes' defective PPE Gloves were the proximate cause of all damages suffered by DRE in the New York Litigation, including significant attorney fees.

211. Therefore, as a result of Two Canoes' breaches and under the terms of the Parties' contractual agreement, Two Canoes is liable to DRE for indemnification for all damages incurred as a result of the New York Litigation, totaling more than the entire value of the $1,768,700 paid for the nonconforming PPE Gloves in addition to lost profits, the costs of replacing the PPE

Gloves, and other business losses associated with unraveling the effects of Two Canoes' breaches, as well as fees and costs in defending DRE in the New York Litigation.

WHEREFORE, DRE prays for judgment against Defendants for an amount in excess of $1,768,700.00, for its reasonable attorneys' fees, for prejudgment interest as allowed by contract or applicable law, for the costs of this action, and for any and all further relief which the Court deems just and equitable.

**SEVENTH CAUSE OF ACTION**
**(Unjust Enrichment)**

212. DRE incorporates by reference all previous allegations as though fully stated and set forth herein.

213. Two Canoes was enriched by receipt of $1,768,700 from DRE.

214. Two Canoes was enriched at DRE's expense.

215. Two Canoes never delivered the goods it agreed to deliver to DRE.

216. Two Canoes instead delivered defective, unfit vinyl examination gloves that remain unusable for their intended purpose and are therefore entirely unmerchantable.

217. Therefore, it would be unjust for Two Canoes to retain the benefits conferred upon it by DRE and at DRE's expense.

218. Therefore, Two Canoes is liable to DRE for the total value of the $1,768,700 previously conferred on Two Canoes, in addition to all applicable interest, fees, and costs.

WHEREFORE, DRE prays for judgment against Defendants for an amount in excess of $1,768,700.00, for its reasonable attorneys' fees, for exemplary damages and punitive damages, for prejudgment interest as allowed by contract or applicable law, for the costs of this action, and for any and all further relief which the Court deems just and equitable

**EIGHTH CAUSE OF ACTION**
**(Good Faith and Fair Dealing)**

219. DRE incorporates by reference all previous allegations as though fully stated and set forth herein.

220. Contracts for the sale of goods include implicit terms requiring the parties to deal with one another in good faith.

221. All contracts contained implied covenants of good faith and fair dealing.

222. Two Canoes and DRE at all times understood their agreements to include obligations of good faith and fair dealing.

223. Two Canoes never disclaimed any obligation of good faith and fair dealing in its agreements with DRE.

224. DRE frequently conveyed its understanding that the PPE offered by Two Canoes was manufactured by Hongray.

225. Two Canoes knew that DRE believed DRE was purchasing PPE manufactured by Hongray.

226. Due to the labeling of the boxes, Two Canoes knew that DRE believed it was inspecting PPE manufactured by Hongray during DRE's inspection of the goods offered for sale by Two Canoes.

227. Two Canoes understood the conditions of the COVID-19 Pandemic and the need to supply quality PPE to DRE's customers and to the Glove Customer.

228. Two Canoes engaged in opportunistic behavior to the detriment of DRE.

229. Two Canoes exercised its judgment and discretion under the agreements of the parties in the shipping packaging it chose for the PPE.

230. Two Canoes exercised its judgment in such a way that DRE was deprived of the ability to adequately inspect the PPE prior to purchase or the transfer of funds.

231. Two Canoes exercised its judgment in such a way that DRE was deprived wholly of the benefit of its agreements with Two Canoes because DRE was deprived of purchasing adequately vetted and tested PPE Gloves.

232. Two Canoes therefore evaded the spirit of its agreements with DRE.

WHEREFORE, DRE prays for judgment against Defendants for an amount in excess of $1,768,700.00, for its reasonable attorneys' fees, for prejudgment interest as allowed by contract or applicable law, for the costs of this action, and for any and all further relief which the Court deems just and equitable.

Respectfully Submitted,

**JAMES SOBBA, LLC**

*/s/ G. Edgar James*
G. EDGAR JAMES MO#49585
LAWRENCE E. NORDLING MO# 62319
4435 Main Street, Suite 910
Kansas City, Missouri 64111
Telephone: (816) 623-0043
ejames@jamessobba.com
lnordling@jamessobba.com

**JONES DAY**

Adam W. Wiers, Esq. (Pro Hac Vice)
77 West Wacker, Suite 3500
Chicago, Illinois 60601-1692
Telephone: (312) 269-4078
Facsimile: (312) 782-8585
Email: awwiers@jonesday.com

**ATTORNEYS FOR PLAINTIFF**
**DRE HEALTH CORPORATION**

## CERTIFICATE OF SERVICE

I hereby certify that on February 25, 2022, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record:

Michael S. Hargens
Husch Blackwell, LLP
4801 Main Street, Suite 1000
Kansas City, MO 64112
Michael.hargens@huschblackwell.com

Michael Goldberg (pro hac vice)
Joanne Liu (pro hac vice)
Pryor Cashman, LLP
7 Times Square
New Yok, NY 10036
mgoldberg@pryorcashman.com
jliu@pryorcashman.com

**Attorneys for Defendants**

/s/ G. Edgar James
Attorney for Plaintiff DRE Health Corporation